Yes Your Honor, I'm here appearing by telephone. Can you hear me? Yes I can. Thank you very much. Before we begin, I just would like to remind everyone to mute your microphone when it is not your turn to speak and remember to unmute it. We occasionally have some echoes and so forth and that would be extremely helpful to us. So with that, we'll begin with Mr. Janich. Mr. Eitner's disability began acutely with emergency brain surgery for a ruptured aneurysm on July 1, 2011 when he was 50 years old. The surgery saved his life, but he was left with residual headaches, vision impairment. He also shortly after developed Wagner's disease, which is an autoimmune disorder that causes pain, fatigue, weakness, and nodules in his lungs. He's also been diagnosed with fibromyalgia, obesity with a very high BMI of 66, chronic pitting edema in his left lower extremity, diabetes, rheumatoid arthritis affecting both hands, and calcific tendonitis and osteoarthritis in his shoulder. Now this case is here in a slightly odd posture. Most cases are an ALJ decision and that's what we're reviewing here. In this case, there was an ALJ decision. The ALJ clearly erred by failing to discuss the opinion of Eitner's treating physician assistant, Mike Myers. But at the appeals council level, they granted review and the administrative appeal judges there, well, attempted to correct that mistake by discussing and rejecting Mr. Myers' opinion. There's a lot of problems in that and my brief discusses all the, why none of their reasons for rejecting his opinion can withstand reason scrutiny. Council, if you don't mind, I'd like to direct you to a slightly different part of the case. I'm sorry, can you hear me? I'm sorry, go ahead, please. And that has to do with fibromyalgia. The ALJ discredited claimant's testimony about the severity of his symptoms related to fibromyalgia pain and fatigue. And I'd like you to address two things. First, whether his testimony was in fact consistent with the medical evidence. And second, whether there is any recognized treatment for fibromyalgia. Well, thank you for the question. Dr. Kedar was his treating rheumatologist and he is the one who diagnosed the fibromyalgia. So there really is no question that there is a valid diagnosis of fibromyalgia. And even the state agency physicians agreed that he had the severe impairment of fibromyalgia. And yet the ALJ determined that he did not. Now, with regard to your question about the consistency of his complaints with the diagnosis of fibromyalgia, his complaints are consistent. What greatly complicates that issue is that many of his problems here, he doesn't just have fibromyalgia. I mean, the rheumatoid arthritis in his hands is what prevents him from using his hands on a sustained basis. The Wigner's causes lots of different problems, which actually overlap with the fibromyalgia because it's an autoimmune disorder that can cause fatigue. And fatigue is one of the big issues of his fibromyalgia. The Wigner's can also cause pain as can the fibromyalgia. So there's so many different things here. His extreme obesity causes him to need to elevate his feet due to the edema. And he spends about three to four hours a day elevating his feet to heart level. So that's not a fibromyalgia issue either. Now, back to your question about the, sorry, with regard to the fibromyalgia, it's well supported. And I don't remember the other part of your question. The other part of my question had to do with treatment. There was something in Meyers' notes about your client having received Tramadol, which is, I know from dealing with my dogs, is a pain-related medication. But is that the only sort of treatment that's available for fibromyalgia, or does the record reflect one way or another? Well, the issue, I guess, is that there is no cure for fibromyalgia. And so the... debilitating symptoms and whether Tramadol, in fact, was prescribed for that purpose. The notes are not easy to follow. They are not. I think that he was trialed with different medications. But I guess the problem is, because he has all of these other problems, there's limitations to how much medication you can take and whether or not... I don't see that there was evidence that there was substantial improvement for medication. And I'm not, obviously not a doctor. I couldn't say if it was adequately trialed or if the doctor had reasons for not doing it further. But Tramadol, it will deal with the symptom. So even assuming, for the sake of argument, that Tramadol would be somewhat helpful with reducing some of the fibromyalgia pain, it's not designed to deal with fibromyalgia fatigue. It has nothing to do with that. Nor would it be able to deal with the fatigue from the Wigner's. Nor would it have... Well, it could have some effect on rheumatoid arthritis in his hands. But once again, even if you're taking a medication like that and you still can't use your hands, that's how you are. You're left with that level of limitation. I have a further question on the fibromyalgia. And that is, how does it ultimately fold into the ultimate result? Because the ALJ had said, well, he's not being actively treated, which you addressed that issue, I think, in response to Judge Graber's question. But then, while it seemed below, there was a total discounting of fibromyalgia, then there was a bit of a throwaway line. But in any event, it's been factored in for the RFC. So I'd appreciate your analysis on that point. Well, the issue with regard to that is that the fatigue from the fibromyalgia was not factored in. There's no acknowledgement of the level of fatigue he was experiencing, which gets back to his testimony. He described having fatigue, and yet it doesn't factor into the... And that actually, the fatigue, in Mike Meyer's opinion, he described that his patient had fatigue. And that would apparently be one of the reasons, I would guess, that he would limit him to only two hours of work per day. But when you look at the actual, more clear-cut functional limitations that would prevent him from working, I think that the need to... The edema that was causing him to sit in a recliner for three to four days, elevating his legs, is a disabling limitation. And the need for that is determined on an individual basis. But a person who weighed, I mean, my figures were like 470 pounds. I mean, he had a lot of problems. And when the edema is as bad as he described it, his need to elevate his feet is reasonable. There was even a medical expert that didn't... Her testimony was a little confusing, but it didn't disagree that a person with his problems could need to elevate their feet. And then the other thing that is a disabling limitation here, which I can't say if it's entirely from the rheumatoid arthritis, or if it's a combination of that and the fibromyalgia. But his limitation on using his hands, that he could use a keyboard for 30 minutes, and then he was done for the day. This was a man who used to, for 30 years or so, 25 years. He had a job that required him to use a keyboard all the time. He was always entering data and using a keyboard. And he couldn't use his hands to that extent anymore, even if he could sit in a normal position to do it. He couldn't sit either. Excuse me. Can I just ask you a little bit more specific question? The ALJ did not list fibromyalgia as one of the severe impairments. This is along the lines of Judge McEwen's question. Does that make a difference here? Did you argue that omitting or leaving out fibromyalgia as a severe impairment was not supported by substantial evidence? I didn't focus on that particular issue in that way. And honestly, there's two different lines of decisions on that. Some that say, well, if you don't mention something like that, it could be harmful error. But I think the more persuasive line of reasoning is in Buck, where it basically says, if you get past step two, and you don't mention one of these severe impairments, but you indeed factor into your residual functional capacity assessment, and you consider the limitations from that impairment throughout the rest of your analysis, it can be harmless error. I think it's harmful error here, because his residual functional capacity assessment does not include the limitations related to fibromyalgia. But once again, when I look at this case, I see these other problems that he has. What is it you're asking us to do? You want us to remand it back to the agency, or what? Well, I think that the evidence here is strong enough and persuasive enough, and there is adequate vocational testimony to support that if a person has to elevate their feet for three... Oh, we've lost you. Mr. Yonage is gone. Stop the clock, please. Casey, please stop the clock. 2.40. Sorry. If they have to elevate their feet that much, and they can't use their hands, it rules out all of the jobs they came up with. And at his age, I mean, he was over 50 at the time of the alleged onset date, and he's 60 now. I mean, at this point, it seems kind of, there's really no evidence that shows that he could do any kind of work. So I think that the remand for the award of benefits is appropriate here based on the evidence. And obviously, in the alternative, we would ask for a remand for a new hearing. Did you wish to save any rebuttal time? Yes, please. Thank you. Thank you. And we will next hear, I mispronounce it again, I fear, Mr. Langhamer. That's the correct pronunciation, Your Honor. Thank you. I did it. Yeah. Thank you. Thank you, Your Honors. Joseph Langhamer on behalf of the commissioner. This is a case where two doctors, Drs. Hale and Amusa, concluded that Mr. Eitner retained the ability to engage in a range of light exertional work despite his medical conditions. And the medical records bore this out. For example, treatment notes referred to Mr. Eitner's conditions as controlled, resolved, and in remission. And Mr. Eitner's activity level confirmed this. For example, contrary to his allegations about being able to stand for just a matter of minutes, he actually functioned well enough to do house and yard work as well as take care of his mother. On these facts, the commissioner reasonably found that while Eitner had functional limitations, he was not disabled under the Social Security Act. This court should affirm that decision. I'd like to start by addressing the argument about fibromyalgia. Judge Pai, as I believe you pointed out, whether or not this fibromyalgia issue makes any difference in the final analysis. And here, this court's Buck decision controls this issue. It controls it in the sense that it can be harmless error. If you don't mind, I'd like to move more directly to the role that it played in this case. The ALJ first essentially discounted it by saying that there was no active treatment for it. And I had a couple of issues with that. One is it's not clear that there is treatment for it other than the recommendation to go to a sleep clinic, which claimant had not pursued. And that issue of why he hadn't pursued it, I didn't see that discussed in the record. And the other issue is whether he was in fact being treated for it with Tramadol. So I guess I'm not sure why it's harmless error here, because if the fatigue level that the claimant testified to had been credited, it could have created a different outcome, and that is one of the key recognized problems with fibromyalgia. It was kind of long-winded, but why is it harmless? Well, it's really, there's two points I would make with respect to that, Your Honor. Number one, we don't need to necessarily reach a harmless error analysis, because the ALJ's recognition of fibromyalgia at step two, and treatment of fibromyalgia at step two, is supported by substantial evidence in the first instance. So when we look at- But he's not taking into account the level of fatigue that results from fibromyalgia. So that's what I'm trying to get at. It causes pain and it causes fatigue. And the level, the ALJ did not essentially credit the level of fatigue and pain to which the claimant testified that could result from fibromyalgia. And I just have difficulty with the ALJ's reasoning in that regard. The ALJ found, and I believe this is at page 141 of the decision, that Mr. Eitner was not receiving active treatment for fibromyalgia. What is the active treatment? If we go to page 167 of the transcript, Dr. Amusa, who is the medical expert who testified in this case, talks about his review of the record with respect to fibromyalgia, and he essentially, or she essentially testifies to what the ALJ found, which is, if we look at the bottom it says, but I'm not seeing where fibromyalgia is actively being treated, so I did not list fibromyalgia as a severe impairment. That doesn't answer my question. If there is no effective treatment, how can the absence of treatment be counted against someone? It's like saying you have an inoperable tumor and you're discredited because you didn't get an operation. I don't understand what the record demonstrates, what kind of treatment is possible that would be effective. Well, on page 168, if we continue to look at what Dr. Amusa talks about, she has asked what would the treatment for fibromyalgia be? And Dr. Amusa says most patients are placed on anti-inflammatory medications. More specifically, they may be placed on a neuropathic-type meds, such as they're also antidepressants, such as Cymbalta or Neurintonin. And Dr. Amusa testified that she did not see active treatment for that. Eitner himself confirmed that he was not being actively treated by Mr. Myers for fibromyalgia. If we look at page 177, the question is asked, are they giving you any specific treatment for that? Mr. Eitner testified Mike hasn't, no. Even if this record could be construed, Your Honor, as Mr. Eitner receiving some level of treatment for his fatigue with respect to fibromyalgia, Your Honor mentioned Tramadol, even aside from these findings, which do support the ALJ's assessment of fibromyalgia, moving to the second question, whether or not this step two issue makes any difference in the end, under Buck, the question is, if you found an impairment severe and medically determinable at step two, any impairment, and you move through the rest of the analysis, if the ALJ considers the symptoms from those severe impairments, even from those non-severe impairments, then what this court has said in Buck is that a step two finding about severity is inconsequential in the final analysis. Mr. Eitner. Counsel, it doesn't take care of the fact that the ALJ discredited claimant's testimony about the extent of his limitations. And if the ALJ improperly discredited it because of not taking into account the fibromyalgia fully, that would make it not harmless, not harmless necessarily as harmful at step two, but harmful in the level of credit given to the claimant and his testimony. With respect to the subject, with respect to the subjective complaint analysis about Mr. Eitner describing the level of fatigue that he was experiencing, whether or not we attribute that to the autoimmune disorder, which this morning Mr. Eitner has acknowledged that there's a great overlap with symptoms between fibromyalgia and this autoimmune disorder that Mr. Eitner was experiencing. So Mr. Eitner's admission of that point, the ALJ found that the autoimmune disorder was severe, and then went through, if we look at page 143 of the ALJ's analysis, the ALJ is acknowledging here the level of fatigue that Mr. Eitner is claiming he experiences, including lying down throughout the day, getting tired, doing very basic activities of daily living, being only able to stand in one place for a matter of minutes. The ALJ analyzes all of those symptoms, all of those subjective complaints about those symptoms, including the fatigue that could be attributed to fibromyalgia in this case, and then provides reasons for discounting those. For example, the ALJ addresses the activity level that Mr. Eitner has performed during the relevant period, which includes admitting walking half a mile on a flat surface, doing housework, he's doing weeding, mowing. At one point he admits to doing minor home repairs. He's also taking care of his ailing mother, which includes driving her to appointments, cooking, cleaning, laundry. He even describes himself as her guardian at one point. These are all instances where the ALJ is looking at Mr. Eitner's activity level, comparing that with the subjective complaints that he has identified, including the fatigue that Your Honor has mentioned him testifying to, and finding an inconsistency there. And in cases like Molina and Thomas, this court has held that an ALJ is entitled to discount a claimant's subjective complaints when they are inconsistent with his activities. And the inconsistencies didn't stop there either. There are medical records that the ALJ reviewed that further undermine Mr. Eitner's subjective complaints about his symptoms. For example, in November of 2011, this is from an ophthalmology clinic, he actually describes feeling great. And he states his joints feel better than they have ever felt. He is now able to bend and twist like never before. We see multiple records between 2011 and even early 2014, after his date last insured, that discuss how this autoimmune disease, which Mr. Eitner claims he experiences fatigue from as well, is in remission, where he's feeling well. For example, in June 2013, it states that his GPA, the autoimmune impairment, is relatively controlled, and he's denying episodes of eye pain or redness. Shortly after the date last insured, in March of 2014, Dr. Guevara describes GPA as on remission clinically. The ALJ also looks at instances where Mr. Eitner was complaining about hand pain. Yet, in June of 2013, an x-ray showed that his hands had only mild arthritic changes and no erosive disease. And later on, he's being treated just using hand cream and Advil for that hand pain relief. And again, with respect to the swelling that Mr. Eitner alleged was a symptom, the ALJ looked at instances where the treatment records are showing just mild swelling, the only trace edema. So the ALJ is looking at the activity levels. The ALJ is looking at the medical evidence and finding inconsistencies between subjective complaints, the subjective complaints that Mr. Eitner has made in this case, and the activity level. I'm sorry, and then the rest of the record. And it's important to note, Your Honor, that this is a restrictive residual functional capacity that the ALJ assessed in this case. The ALJ is limiting Mr. Eitner to – the ALJ is not finding that Mr. Eitner is symptom-free or that he doesn't get tired. The ALJ is limiting Mr. Eitner to just a range of light exertional work that does not require standing or walking for more than two hours in a total work day, along with various other postural limitations, including environmental limitations as well, to account for these eye complaints that Mr. Eitner is alleging as well. So the ALJ is affording significant limitations to Mr. Eitner. The ALJ found simply that the level of subjective complaints that Mr. Eitner made in this case did not align with the overall record. If Your Honors have no further questions, I would request that the Court affirm the Commissioner's final decision finding Mr. Eitner not disabled. I don't believe I see anybody reaching for the microphone, so thank you, Counsel. Mr. Yannick, you have some rebuttal time remaining. Remember to unmute, please. Yes, now I'm unmuted. Thank you. First, I want to address fatigue. It's interesting. If a person has one severe impairment that causes fatigue, the ALJ has to – unless the ALJ gives a convincing reason not to accept that testimony, he has to factor in that fatigue. Here, there are two impairments, as I've pointed out and as the government has conceded, and yet the ALJ still didn't factor in any fatigue. Similarly, his residual functional capacity assessment doesn't factor in limitations for his hands and elevating his feet. It doesn't matter how limited the ALJ – the ALJ could come up with a thousand limitations, but if it doesn't include all of the limitations that a person has, it's not supported by substantial evidence. There are – let's see. The Commissioner was pointing to the one functional statement that was submitted by Mr. Eitner, but this happens a lot where they'll point to one fact in there, which is once a month he goes shopping for two hours while ignoring that in that same report, he talks about how tired he gets, how fatigued he gets, how he has any stamina, how when he does things, he has to do them. He can garden for whatever. He can garden for an hour, but that's it. He's done. He – and the other thing is that's not taken into account here is that his level of symptoms have varied over time, but they've never been – he's never been well enough that he could do anything for a full-time eight-hour day five days a week. Let's see. I'm going to point to just page 314 as one example where he talks about how he tires so easily. Anyway, if there's nothing further, I would ask for you to reverse ALJ's decision and remand his case for the award of benefits or for a new hearing. Thank you. Thank you, counsel. Thanks to both of you for helpful arguments. The case just argued is submitted for decision.
judges: McKeown, Graber, Paez